IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Terry S. King, | ) | C.A. No. 9:05-1774-PMD-RSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Marriott International, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This claim of employment discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et. seq. ("ADEA"), is before the undersigned United States Magistrate Judge for a report and recommendation on the defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56 filed on May 16, 2006.  28 U.S.C. § 636(b).

The plaintiff, Terry S. King, filed his complaint against the defendant, Marriott International, Inc., on June 21, 2005, in which he asserted a claim for retaliation under the Age Discrimination in Employment Act ("ADEA") and state law causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of contract accompanied by a fraudulent act.

The plaintiff filed an opposition to the summary judgment motion, the defendant filed a reply, and the oral argument before the undersigned was had on the motion on December 6, 2006.

1

Discovery is complete.  Hence it appears consideration of the motion is appropriate.

Defendant asserts that it is entitled to summary judgment on the ADEA retaliation claim since Plaintiff has not shown that the actual decisionmakers knew about the plaintiff's protected activity at the time decisions to eliminate King's position and not to hire King in a replacement position were made.  Therefore King cannot establish a prima facie case of retaliation because he cannot establish that a causal connection existed between his protected activity and the alleged adverse employment decisions.

### FACTS

In the case at bar, the facts taken in a light most favorable to the plaintiff as the nonmoving party with all reasonable inferences drawn in favor of the plaintiff, to the extent supported by the record, are as follow.

In early 1987, King went to work for Marriott as an engineer and he was transferred to Washington D.C. in 1989 as a Divisional Director of Engineering.  In 1997 he was made Regional Engineering Manager (REM) for the Mid-Atlantic Region, one of 6 Marriott regions.  All regions had one REM except the Mid-Atlantic Region which had 2 REMS: King and Arlie Kisner.  King reported to the Regional Vice President for Engineering, Bob Jones, who in turn reported to a Regional Senior V.P. of Operations "with dotted line reporting responsibility" to Lenny

Jachimowicz, the Vice President of Lodging Engineering. Jachimowicz reported to Pat Maher, the Senior Vice President of Lodging Engineering.

The following events are not the alleged protected activity for which King was allegedly retaliated against, but are set forth only as background information leading up to the protected activity which is an EEOC charge brought on July 14, 2003.

On May 9, 2002, King posted for the position of Director of Facilities at a Marriott hotel that was scheduled to open on the island of St. Kitts. King's "life partner", Peg Kinnally, posted for a job on St. Kitts also. Neither King nor Kinnally got the job. On July 26, 2002, King complained a human resource representative, Vicki Stille, that he and Kinnally were not hired for the jobs in St. Kitts despite being extremely qualified. King also asked Stille about the procedures for making a complaint under Marriott's Guarantee of Fair Treatment (GFT) policy, and asked Stille to keep the call confidential. Fifteen minutes after the call, King's direct supervisor Bob Jones called King and asked King why he thought of making a GFT complaint because his Kinnally did not get a job. Jones told King that if he filed a GFT complaint that King's career at Marriott would be in jeopardy. (King depo. 68-72, 181-182).

On August 2, 2002, Kinnally sent a letter to J.W. Marriott, Jr. complaining that she and King were rejected for the positions

3

in St. Kitts.  The letter referred to King and it also referenced
the GFT policy but made no complaints of age discrimination.
Kinnally copied the letter to, among others, Pat Maher.  After
Maher received it, he called Jones to ask him if he had received
the letter and Jones told him he had.  Maher then asked Jones if
there was anything he could do to help, and Jones declined.
Maher then asked Jones if he had the matter handled, and Jones
responded, "yes." ( Maher depo. pp. 34-35).  Maher also gave
Jachimowicz a copy of Kinnally's letter, and Jachimowicz advised
Jones of the letter. (Jachimowicz depo. pp. 41-43).  In addition,
Stille was aware of the letter. (Stille depo. pp. 39-40).

The St. Kitts job came open again and on January 15, 2003,
King posted for it, but he was again unsuccessful.

In February 2003, King made three telephone calls to the GFT
hotline and each time he left a message.  The calls were not
returned. (King depo. pp. 80, 89, 93, 96-97).  He did not ever
actually make a GFT complaint and there is no evidence anyone at
Marriott knew King made the calls. (King depo. 68, 69, 80, 81).

On March 7, 2003, King met with Jones and Paul Tchorni, the
Regional Director of Human Resources for the Mid-Atlantic Region,
and complained that Jones had threatened his job when he refused
to go to a strip club with him. (King depo. p. 95).  This alleged
sexual harassment threat was part a prior charge of
discrimination, which was filed untimely and no subsequent action

4

was brought.  Torchini had no decisionmaking role in the positions at issue in this action.

Again, on March 21, 2003, King posted for a Director of Services position at the St. Kitts Marriott but King was told that he  was not qualified. (King depo. pp. 187-188).  King also made this failure to hire claim in his first EEO charge.  No St. Kitts decisionmaker was a decisionmaker in the hiring for the thirteen positions at issue in this action.

The protected activity for which King complains that he was subjected to illegal retaliation is that on July 13, 2003, King brought an EEOC charge alleging age discrimination in the decision not to hire him in St. Kitts, retaliation for his trying to report sexual harassment by King's supervisor Jones on the GFT hotline, and retaliation for Kinnally's EEOC age complaint about St. Kitts.  "Marriott" became aware of the EEOC charge on July 30, 2003, according to Plaintiff.  The following decisions to eliminate his REM job through restructuring, and his nonselection for numerous jobs thereafter, are alleged to be in retaliation for having filed the EEOC charge.

A decision to eliminate the REM positions including King's REM position was made in 2002 by Clare Kevill, a project assistant in the engineering department who was assigned the task of analyzing the engineering positions. (Kevill dep.)  Kevill's decision was approved and she began working with corporate human

5

resources in creating a new job specification and working out the
logistics of a reorganization that same year, well prior to
King's protected activity.

On October 14, 2003, King and Kisner were informed there was
going to be a re-organization within the engineering discipline
at Marriott; that all REM positions, including theirs, were being
upgraded or changed to Regional Director of Engineering positions
(RDE); that there would only be one RDE in the Mid-Atlantic
Region; that both King and Kisner would therefore lose their REM
positions; and that they could each apply for the RDE position in
the Mid-Atlantic Region and the RDE positions in the other five
regions. (King depo. pp. 130-131, 133).  The next day King
instructed Stille to post him for all RDE jobs in all of the six
regions. (King depo. p. 133; King Aff).

Sheri McCool developed hiring guides for the regions to use
in filling the newly created RDE positions. (McCool Aff.).  The
guides dictated who the decisionmakers should be for selecting a
new RDE.  They were the Regional VP of Engineering, the Regional
VP of Human Resources, and the Regional VP of CRST. (McCool Aff.;
Jones Dep. p. 26, lns. 1-7; Stille Dep. p. 48, lns. 15-19).
McCool made the decision that the selection process should begin
with internal and external postings and she created the form used
to narrow the candidate pool. (McCool Aff.).  McCool made the
decision that each candidate who made it through the initial

6

assessment should then undergo taking the Divine Inventory, a candidate profile assessment tool utilized by Marriott for certain positions. (McCool Aff.). McCool made the decision that each candidate who made it past the initial assessment should then be required to have an interview with the decision making panel and she created the interview guides to be used by the decision making panel to ensure that all candidates were asked similar questions. (McCool Aff.; Stille dep. p. 58, lns. 16-22).

This information was disseminated to Vicki Stille, VP of HR for the Mid Atlantic Region, who then implemented McCool's outline for the hiring procedures and selection process. (Stille dep. p. 42, ln. 21 through p. 45, ln. 13, p. 47, lns. 10-19). The panel used the selection criteria outlined by McCool. (Jones dep. p. 34, lns. 1-22).

When the RDE position for the Mid-Atlantic region was posted, a total of seven people applied. Following McCool's format, Bob Jones narrowed the candidate pool to four: Kisner, King, Randy Gaines, and Bill Thomas. (Stille Ex. 1; Stille Dep. p. 103, ln. 9 through p. 105, ln. 18; Stille Dep. p. 108, lns. 11-20). Jones rated King and Gaines as "medium" and Kisner and Thomas as "high". (Stille Ex. 1; Stille Dep. p. 89, ln. 19 through p. 90, ln. 7). These ratings are consistent with their last several performance reviews where Kisner and Thomas consistently received the highest ratings, and King was

7

considered a step lower. (Performance reviews of Kisner and Thomas; King's performance reviews).

King, Gaines, Kisner, and Thomas all took the on-line Divine Inventory Survey and their answers were sent directly to Kristin Walsh of Marriott International who was not aware of who the candidates were, other than their names. She was not given any information about their prior job history or performance, nor was she advised of any complaints King had made. She graded their Divine Inventories using only the following information: (1) the candidates' answers; (2) the job description created by Kevill, McCool, and Maher; and her training on interpreting Divine Inventory Surveys. Walsh graded Gaines and Thomas as the most suitable candidates for the RDE position; King and Kisner scored considerably lower. (Aff. Kristin Walsh; See also Stille Dep. p. 45, ln. 14 through p. 46, ln. 3, Stille Dep. p. 118, ln. 10 through p. 119, ln. 1).

Walsh reviewed her assessment of each candidate with Jones, Stille, and Victor Crawford, the Mid-Atlantic Regional VP of CRST. While she did not officially "rank" the candidates, she made it clear that King's score did not make him a compatible candidate for the job. She explained to them that King was statistically on the lower end of the scoring because his listening for understanding score was low and his aggressiveness score was very high; he was likely to be very blunt and rub

people the wrong way. During Walsh's conversations with Jones, Stille, and Crawford, there was never any mention of King's age, prior performance, personnel record, complaints of any kind, negative references, or filing of EEOC charges. (Aff. Kristin Walsh; see also Stille Dep. ex. 3, 4, 5, and 6).

While the Divine Inventories were being scheduled, taken, and graded, Stille contacted each of the four candidates to schedule interviews with the panel of decisionmakers. The other three candidates chose a date in November. King was offered a date in November and December, and he chose to be interviewed on December 12, 2003. (See E-mail correspondence from King). The other three candidates interviewed in person before the panel. King was supposed to interview in person, but he cancelled the in-person interview because he was sick and he asked to do the interview by phone. (See E-mail correspondence between King and Stille; Jones Dep. p. 30, lns. 3-18).

All interviews lasted approximately the same amount of time because they used interview guides provided by Marriott corporate. (Stille Dep. p. 91, ln. 10 through p. 92, ln. 6). The interviewers thought that King was unimpressive and failed to articulate any examples of strategic thinking, a component all three decision makers understood was an essential component of the new position. (Stille Dep. p. 54, lns. 11-21; Jones Dep. p. 125, lns. 12-15; Crawford Dep. p. 83, lns. 12-13).

9

The three decisionmakers discussed the candidates and concurred that the two top candidates were Thomas and Gaines. (Jones Dep. p. 35, ln. 7 through p. 38, ln. 3; Stille Dep. p. 51, ln. 18 through p. 54, ln. 21, p. 138, ln. 4 through p. 151, ln. 20; Stille ex. 2 and 13). Further King was considered to be the least suitable candidate. (Jones Dep. p. 120, ln. 22 through p. 123, ln. 16; Stille Dx. 2; Stille Dep. p. 68, ln. 14 through p. 69, ln. 9; Stille p. 89, lns. 10-18). In the end, Thomas was selected. He was selected over Gaines because they felt he could hit the ground running since he was already in the region. (Crawford Dep. p. 53, ln. 22 through p. 54, ln. 2; Stille dep. p. 51, lns. 7-11; Jones dep. p. 132, ln. 14 through p. 133 ln. 14).

Crawford was the highest ranking of the decisionmakers and there is no evidence that Crawford knew anything about King's EEOC charge. (Jones Dep. p. 33, lns. 4-16; Stille dep. p. 36, lns. 3-7, p. 38, lns. 3-6). There is no evidence Jones was aware that King filed an EEOC charge. (Jones Dep. p. 114, ln. 12 through p. 115, ln. 5; Stille Dep. p. 37, ln. 21 through p. 38, ln. 2, p. 41, ln. 8 through p. 42, ln. 4). Stille was aware of King's EEOC charge, but knew none of the details. (Stille Dep. p. 41, lns. 8-20). She did not tell the other two about the EEOC charge and she deposed that she was careful to ensure that King got fair consideration. (Stille dep. p. 37, lns. 2-20; p. 36,

10

lns. 3-7; Jones dep. p. 31, lns. 12-19). The EEOC charge was not discussed among the decisionmakers. (Stiles dep. p.36, ln. 20 through p. 37, ln.1).

## OTHER MARRIOTT JOBS

When King first learned that his position as REM was being eliminated, he sent an e-mail to Stille expressing concern over losing his job and not receiving another position within Marriott in which he wrote, "it appears that positions at my present level are extremely limited according to what is presently on Marrweb." (October 14, 2004, correspondence from King). Marriott coded King as a "1" for rehire purposes, which coded him as a rehire candidate. (See severance package). The defendant offered him direct contact with neutral reference individuals, in order to allay his fears of retaliation. Id. The defendant company helped him post for available jobs and gave him specific human resource personnel contacts to direct reference checks. There is no evidence King utilized these contacts, and there is no evidence that anyone gave King a negative job reference.

First, King posted for the other 5 RDE positions in the Midwest, Northeast, Southeast, South Central, and Western regions. In each region, he was competing with other REMs who were losing their position, as well as other internal and external competition. (See Aff. of Mike Yonker, George Pinksten;

11

Gil Zanchi; Joel Loeb; and Robert Bahl). With the exception of Lenny Jachimowicz who assisted with the selection process in the South Central region, none of the decisionmakers in the other regions were aware of King's EEOC charge. (See Aff.s of Mike Yonker, George Pinksten; Gil Zanchi; Joel Loeb; and Robert Bahl). There is no evidence that Lenny Jachimowicz, who was one of the five decisionmakers, disclosed the fact that King had filed an EEOC charge, or that Jachimowicz allowed that fact to influence him or others. (See Aff. of Joel Loeb).

King also posted for the following Director of Engineering positions at full service hotels: 1) Marriott Miami Biscayne Bay; 2) Marriott Miami South Beach; 3) Marriott Tampa Renaissance; 4) Marriott Curacao; 5) Marriott Jamaica Renaissance; 6) Ritz Carlton Key Biscayne; 7) Ritz Carlton Grand Cayman; and 8) Ritz Carlton Coconut Grove. All the positions had multiple decisionmakers. There is no evidence that any of the decisionmakers were aware that King had filed an EEOC charge. (Aff. Sonia Torres, Kimberly Wilson, Carole Matthews, Jorge Landa, Hans Roerbhein, Jacqueline Volkart, Jean Cohen, and Sandra Lopez). There is no evidence that any of the decisionmakers had discussions with individuals who did have knowledge of the charge who convinced them not to hire King. (Aff. Sonia Torres, Kimberly Wilson, Carole Matthews, Jorge

12

Landa, Hans Roerbhein, Jacqueline Volkart, Jean Cohen, and Sandra Lopez).

King complained that he was owed a last annual review from Jones which had been due in July 2003.  On January 30, 2004, Jones wrote King's review and gave King a 2 or "Commendable" rating, the same rating he had always gotten previously from Jones.  Jones also wrote that "Terry's improvement areas continue to be the same as previous years, dealing with the people-side of the business.  Terry's customers still see him as lacking in communication, slow to respond, and unreliable."  Kisner  had received his usual rating of 1 or "Exceptional."

King's last work day was January 2, 2004, and in that month Sandy Leandro, a Vice President of Resorts Services for MVCI telephoned Jachimowicz and advised him of a job opening for a Regional Director of Engineering at MVCI in Orlando, Florida. She asked Jachimowicz if he was aware of any other employees that he could recommend for the job. Jachimowicz gave Leandro Kisner's name and told her that Kisner had multi-unit experience and that he thought Kisner would do a good job for her.  He offered to leave a message for Kisner advising him of the job opening. Jachimowicz did not mention King to Leandro and did not tell King about the position.  Thereafter Jachimowicz contacted Kisner and told him about the job. (Jachimowicz depo. pp. 78-80, 132-137). Kisner then contacted Tchorni, who in turn posted Kisner for the

position.  Once Stille found out that Kisner posted for the job,
she called Leandro to assist him in getting the position. (Stille
depo. p. 95).  Maher also called Leandro on behalf of Kisner.
(Maher depo. pp. 49-53).  Kisner was interviewed by telephone by
Leandro and was offered the job. (Kisner depo. pp. 15-18, 21).
King did not know the job was available because it was posted as
a Director of Resorts job, a designation that would not advise
anyone in the engineering discipline that it was actually a DOE
position or that a DOE Regional position was open. (King depo.
pp. 230-232).

On June 2, 2004, Kisner visited King and Kinnally at their
home and told them that Jachimowicz told him that King was "off
his rocker" and that if King had not filed that complaint against
Marriott they would have found him a soft landing. i.e., another
job after the reorganization, just like they did for Kisner. (Ex.
7, plf. depo. and Ex. 13, P. Kinnally depo.).

## SUMMARY JUDGMENT STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), a district court must
enter judgment against a party who, "after adequate time for
discovery ... fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial."
Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552
(1986).  Where "there is no genuine issue as to any material fact

14

and ... the moving party is entitled to judgment as a matter of law," entry of summary judgment is mandated.  Fed. R. Civ. P. 56(c).

To avoid summary judgment on a defendant's motion, a plaintiff must produce evidence creating a genuine issue of material fact.  Issues of fact are in genuine dispute where the evidence "may be reasonably resolved in favor of either party."  Id. at 250.  In this regard, the trial ". . . judge must ask himself not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Id. at 252.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

However, "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512 (1986).  Additionally, the plaintiff "cannot create a genuine issue of material fact through mere speculation

or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

## AGE DISCRIMINATION LAW

The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 623(a)(1); see, Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 124 S.Ct. 1236, 1243 (2004) (explaining that the ADEA "protect[s] a relatively old worker from discrimination that works to the advantage of the relatively young").

The ADEA § 623(d) tracks Title VII's language in prohibiting retaliation as well. Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

To prevail on his retaliation claim in the absence of direct evidence, King must satisfy the three-step proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). First, a plaintiff must establish, by a preponderance of the evidence, a prima facie case of retaliation. To make a prima facie case of retaliation under the ADEA, a

16

plaintiff must show that (1) he engaged in a protected activity,
such as filing an EEO claim, (2) that he suffered a materially
adverse action, and (3) that there is a causal connection between
the protected activity and the materially adverse action.  Causey
v. Balog, 162 F.3d 795, 803 (4th Cir. 1998).   In order to show a
casual connection Plaintiff must either establish that all the
decisionmakers were aware of his protected activity or he must
show that the one decisionmaker who had knowledge of the
protected activity dominated the decisionmaking process so as to
become the actual decisionmaker.  See, Hill v. Lockheed Martin &
Logistics Management, Inc., 354 F.3d 277, 291 (4th Cir. 2004).

       Once established, the burden shifts to the employer to rebut
the presumption of retaliation by articulating non-retaliatory
reasons for its actions.  Texas Dep't of Community Affairs v.
Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089 (1981).  The
employer's burden at this step is a burden of production only and
does not involve a credibility assessment.  See, St. Mary's
Center v. Hicks, 509 U.S. 502, 509 (1993).  All that is required
for the court to determine is whether the employer's stated
reasons, if taken as true, would permit the conclusion that there
was a legitimate reason for its actions.  Id.  If the employer
meets its burden of production, the presumption raised by the
prima facie case is rebutted and "drops from the case," and the
plaintiff bears the ultimate burden of proving that he has been

17

9:05-cv-01774-PMD    Date Filed 02/27/07    Entry Number 57    Page 18 of 24

the victim of retaliation. <u>Reeves v. Sanderson Plumbing Prods.,</u> <u>Inc.</u>, 530 U.S. 133, 142-42, 120 S.Ct. 2097(2000) (internal quotation marks omitted); <u>St. Mary's</u>, at 506-11, 113 S.Ct. 2742.

### DISCUSSION

A review of the record and relevant case law reveals that the defendant's motion for summary judgment on the ADEA claim should be granted and the court should exercise its discretion to decline supplemental jurisdiction over the remaining state law causes of action and dismiss them without prejudice.

The plaintiff first argued that this is a direct evidence case based upon Kisner telling King and Kinnally that Jachimowicz told him that King was "off his rocker" and that if King had not filed that complaint against Marriott they would have found him a soft landing, i.e., another job after the reorganization, just like they did for Kisner. (Ex. 7, plf. depo. and Ex. 13, P. Kinnally depo.).  However, as multiple level hearsay not subject to any exception, "[e]vidence of this type is neither admissible at trial nor supportive of an opposition to a motion for summary judgment," <u>Greensboro Prof'l Fire Fighters Ass'n v. Greensboro</u>, 64 F.3d 962, 967 (4th Cir. 1995), <u>see</u> <u>also</u>, Fed.R.Civ.P. 56(e).

Without direct evidence King must establish a prima facie case of retaliation for having engaged in protected activity. Here, it is undisputed that King engaged in protected activity when he filed his discrimination charge with the EEOC on July 14,

2003.  See, e.g., Carter v. Ball, 33 F.3d 450, 460 (4th Cir.
1994) (filing a complaint with the EEOC is a protected activity).
It is also undisputed that his nonselection for another position
and termination were adverse employment actions.[1]  See, e.g.,
Stewart v. Ashcroft, 352 F.3d 422 (C.A.D.C. 2004).  To survive
summary judgment, therefore, King must have evidence from which a
reasonable factfinder could conclude that a causal connection
existed between the protected activity and the adverse actions.
It appears that King cannot carry his burden in this regard and
that Marriott is, therefore, entitled to judgment as a matter of
law.

     The evidence is uncontradicted that the only decisionmaker[2]

_____

[1] King has not demonstrated an adverse employment action to
the extent that he claims he was entitled to a "soft landing"
i.e., he contends that "Marriott always made sure that long-term
engineering employees who worked at the regional level would have
replacement jobs... ." (Pl. Opp. Br. at 22.) It is King's
subjective belief that representatives of Marriott, in particular
Stille and Jachimowicz, did not do enough to try to find him
another job with Marriott.  This is not an adverse employment
action within the meaning of the ADEA: the anti-retaliation
provisions of the ADEA do not entitle an individual to
employment, job reassignment, rehire, or preferential job
placement.  Further, King never alleged any entitlement to a
"soft landing" and a denial thereof by non-action in his EEOC
charge. (Ex. 23 to King Dep.).

[2] Plaintiff also argues Lenny Jachimowicz was a
decisionmaker.  Jachimowicz explained his role as that of having
"veto" power of those persons selected by other decisionmakers
for the RDE positions. (Jachimowicz dep. pp. 32, 46, 96.
Crawford confirmed Jachimowicz's role. (Crawford Dep. pp. 51,
52).  Stille described Jachimowicz's role as approving the
candidate as a matter of "protocol." (Stille dep. p. 46).  The
closest Jachimowicz came to assisting in an actual decision

aware of King's EEOC charge was Vicki Stille, one of three decisionmakers for only one job – the RDE position for the Mid-Atlantic region. (Crawford Dep. pp. 51, 52, 106; Stille Dep. p. 46). All other decisionmakers in the RDE position for the Mid-Atlantic region were unaware King filed an EEOC charge related to his failure to get job offers in St. Kitts. (See affidavits of Kevill, McCool, Yonker, Pinksten, Zanchi, Loeb, Bahl, Torres, Wilson, Matthews, Landa, Roerbhein, Volkart, and Lopez, attached to Def's Mot. For Sum. J; Maher Dep. p. 65, lns.19-22; Maher Dep. p. 66, lns. 1-4; Jones Dep. p. 114, ln. 12 through p. 115, ln. 5).

Likewise, it is uncontradicted that the decision to reorganize the engineering department and eliminate the REM positions was made by Claire Kevill, Sherry McCool, and Pat Maher. (See Kevill Aff. attached to Def.'s Mot. for Sum. J; Maher Dep. p. 70-72). The evidence of record is uncontradicted that none of these individuals were aware that Plaintiff had filed a previous EEOC charge of discrimination. (See aff. of Kevill, McCool, attached to Def's Mot.; see also Maher Dep. pp. 86, 87).

---

related to a position was the South Central region where he was one of five decisionmakers, and his only role was to interview the two finalists per the special request of the actual decision makers. King was not one of the two finalists, and Jachimowicz had nothing to do with excluding him from the final two. (Jachimowicz dep. p. 90-94, see Plaintiff's Response to Def's Mot. For Sum. J, Ex. 6).

With respect to the positions for which he sought employment after the elimination of his job, King still must establish that the ultimate decisionmaker was aware of his protected activity. Multiple decisionmakers were involved in the hiring decisions. (See affidavits of Kevill, McCool, Yonker, Pinksten, Zanchi, Loeb, Bahl, Torres, Wilson, Matthews, Landa, Roerbhein, Volkart, and Lopez, attached to Def's Mot. For Sum. J; Maher Dep. p. 65, lns.19-22; Maher Dep. p. 66, lns. 1-4,; Jones Dep. p. 114, ln. 12 through p. 115, ln. 5). King has not shown either that all decisionmmakers involved in any of the 13 jobs for which King applied after the elimination of his REM position knew of his protected activity, or that the one decisionmaker who had knowledge of the protected activity dominated the decisionmaking process so as to become the actual decisionmaker. See, Hill v. Lockheed Martin & Logistics Mgmt., Inc., 354 F.3d 277, 291 (4th Cir. 2004). The evidence is uncontradicted that neither Stille, nor Jachimowicz even if he is considered a decisionmaker, were the ultimate decisionmakers for any vacant positions for which King applied. They were only involved indirectly in 2 of the 13 jobs for which King allegedly applied. (See aff. of Kevill, McCool, Yonker, Pinksten, Zanchi, Loeb, Bahl, Torres, Wilson, Matthews, Landa, Roerbhein, Volkart, and Lopez; Maher Dep. p. 65, lns.19-22; Maher Dep. p. 66, lns. 1-4; Jones Dep. p. 114, ln. 12 through p. 115, ln. 5). Therefore, in order to show causation

21

between his protected activity and alleged adverse employment
action (i.e., denial of job openings), King must establish that
Stille and Jachimowicz influenced the ultimate decisionmakers in
such a way that would violate the ADEA's anti-retaliation
provisions.  King has failed to come forward with any evidence to
indicate that Stille or Jachimowicz participated in activity to
blackball or impede King's ability to find additional employment
at Marriott.  Since Stille and Jachimowicz were not the ultimate
decisionmakers, and because King has failed to present sufficient
evidence to indicate that they influenced the ultimate
decisionmakers in anyway that would be retaliatory toward King,
his retaliation claim fails for lack of causation.

     In short, since the evidence is not in dispute that the
other decisionmakers involved in filling vacancies were not aware
of King's protected activity, and that Stille and Jackimowicz did
not so dominate the group decisionmaking process so that they
were the true ultimate decisionmaker, King has failed to
establish the third prima facie element of causation, and
Marriott is entitled to summary judgment on King's retaliation
claim.

     If the court accepts this report and recommendation, then
the only original federal jurisdiction claim will be dismissed.
28 U.S.C. § 1367(c)(3) provides, "The district courts may decline
to exercise supplemental jurisdiction over a claim under

22

subsection (a) [providing for supplemental jurisdiction over all claims forming the same case or controversy] if the district court has dismissed all claims over which it has original jurisdiction ··· ·"  The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) (district court did not abuse its discretion in declining to retain jurisdiction over the state law claims).  See also, e.g., United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726-27, 86 S.Ct. 1130 (1966); Revene v. Charles County Comm'rs, 882 F.2d 870, 875 (4th Cir. 1989).

Therefore, it is also recommended that the court exercise its discretion to decline supplemental jurisdiction over the remaining state law claims and dismiss them without prejudice to their being filed in state court, thus ending the action here.

<h3 style="text-align:center">CONCLUSION</h3>

Accordingly, since there exists no genuine material question of fact on the causation element of the ADEA cause of action thus entitling the defendant to judgment as a matter of law, it is recommended that the defendant's summary judgment motion be granted on the ADEA VII cause of action and the balance of the

claims be dismissed without prejudice to their being brought in state court.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina

February 27, 2007