**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| Terry S. King, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No.: 9:05-1774-PMD-RSC |
| v. ) | |
| ) | **ORDER** |
| Marriott International, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on Defendant Marriott International, Inc.'s ("Defendant" or "Marriott") Motion for Summary Judgment. In accordance with 28 U.S.C. § 636 (b)(1)(B), this matter was referred to United States Magistrate Judge Robert S. Carr, who created a report and recommendation ("the R&R"). The Magistrate Judge recommended that Defendant's motion for summary judgment be granted as to Plaintiff's state law claims, and that this case be dismissed. A party may object, in writing, to a report and recommendation within ten days after being served with a copy of that report. 28 U.S.C. § 636 (b)(1). Plaintiff filed timely objections to the R&R.

**BACKGROUND**

The facts of this case, as supported by the record and considered in the light most favorable to Plaintiff Terry King ("Plaintiff" or "King"), are set forth as follows:

In early 1987, Terry King went to work for Marriott in Michigan as an engineer. (King depo. at 7.) In 1989, Marriott moved King to Bethesda, Maryland, where Marriott is headquartered. (Id. at 8-9.) In 1997, Marriott offered King a position as the Regional Engineering Manager (REM) for the Mid-Atlantic Region, one of six Marriott regions. The letter offering King the REM position contained the following language: "This offer letter is not a contract of employment. This letter

1

constitutes the full commitments which have been extended to you." King read the letter, accepted the offer of employment, and signed the letter. Except for a period of about nine months, King maintained an office in Maryland and reported to individuals in Bethesda, Maryland from 1989 until the termination of his employment with Marriott. (Id. at 8.) During this time, King resided in and performed a significant portion of his job responsibilities in Hilton Head, South Carolina. (Id. at 14.)

At some point after 1993,[1] Marriott distributed a handbook to its employees describing Marriott's key employment policies (the "handbook"). King received and signed the handbook, but he does not recall when or where it was given to him.[2] Among other policies, the handbook described Marriott's "Guarantee of Fair Treatment" policy and "Policy on Harassment & Professional Conduct." The handbook also contains a section entitled "**Employer at Will**," in which Marriott explained that "[n]othing in this manual shall be deemed to alter the 'at will' status of associates working at the company or create a contract of employment for any specific period of time." King signed a "Statement of Understanding," affirming that he had "read, understood, and

---

[1] The booklet refers to the Family and Medical Leave Act of 1993. For this reason, the court finds the booklet must have been created and distributed after 1993 when this Act was passed.

[2] King deposition at pages 43-44:

Q: Did you have an employment contract with Marriott?
A: Yes, I did.
Q: What was it?
A: That manual right there. The document we had copied.
Q: I'm showing you what has been marked as exhibit number three to your deposition. Is this the document you were pointing at just a moment ago?
A: Yes.
Q: All right. When did you get this document?
A: I'm not, I'm not sure. It was, as far as I can recall it was the last document that I was given.

agree[d] to adhere to the information contained in this booklet regarding the below referenced topics."

In May of 2002, when he was forty-nine years old, King applied for a position as Director of Facilities at a Marriott hotel scheduled to open on St. Kitts. King's girlfriend, Peg Kinnally, also applied for that position. Neither King nor Kinnally got the job. On July 26, 2002, King complained to Vicki Stille, a human resource representative, that he and Kinnally were not hired despite being extremely qualified. King asked Stille about the procedures for making a complaint under Marriott's Guarantee of Fair Treatment policy. Fifteen minutes after this call, King's supervisor Bob Jones called King and asked King why he thought of making a GFT complaint. Jones told King that if he filed a GFT complaint, King's career at Marriott would be in jeopardy. (King depo. 68-72, 181-182.) King did not pursue the complaint any further at that time.

The St. Kitts position came open again and on January 15, 2003, King posted for it, but was again unsuccessful. On March 21, 2003, King also posted for a Director of Services position at the St. Kitts Marriott; King was told he was not qualified.

On July 13, 2003, King brought an EEOC charge alleging age discrimination in the decisions not to hire him in St. Kitts, retaliation for his trying to report harassment by King's supervisor Jones on the GFT hotline, and retaliation for his girlfriend's EEOC age complaint about St. Kitts. This EEOC charge is the protected activity for which King complains he was subjected to retaliation in breach of his employment contract.

On October 14, 2003, King was informed there was going to be a re-organization within the engineering discipline at Marriott and that all REM positions, including his, were being upgraded and changed to Regional Director of Engineering positions (RDE). As a result of this

3

reorganization, King was told that he would lose his REM position, but could apply for the RDE position in the Mid-Atlantic Region and the RDE positions in the other five regions. The decision to eliminate the REM positions, including King's REM position, was made in 2002 by Clare Kevill, a project assistant in the engineering department. (Kevill Affidavit.) Marriott approved Kevill's decision and she began working with corporate human resources in creating a new job specification and working out the logistics of a reorganization that same year, well prior to King's protected activity. (Id.)

Once these RDE positions were posted on Marriott's internal website, King posted his application for all of these positions. In addition to the RDE position for the Mid-Atlantic Region, King applied for the other RDE positions in the Midwest, Northeast, Southeast, South Central, and Western Regions. In each region, he was competing with other REMs who were losing their position, as well as other internal and external candidates. King was not hired for any of the RDE positions.

King also posted for Director of Engineering positions at the following full service hotels: (1) Marriott Miami Biscayne Bay, (2) Marriott Miami South Beach, (3) Marriott Tampa Renaissance, (4) Marriott Curacao, (5) Marriott Jamaica Renaissance, (6) Ritz Carlton Key Biscayne, (7) Ritz Carlton Grand Cayman, and (8) Ritz Carlton Coconut Grove. King was not selected for any of these positions.

On June 21, 2005, King filed a complaint against Marriott International asserting state law causes of action for (1) Breach of Contract/Wrongful Discharge, (2) Breach of Implied Covenant

of Good Faith and Fair Dealing, and (3) Breach of Contract Accompanied by a Fraudulent Act.[3] King alleged that the decision to eliminate his job and the failure to hire him for numerous jobs thereafter were in retaliation for his having filed the EEOC charge. He asserted that the Marriott handbook's "Guarantee of Fair Treatment" policy and "Policy on Harassment & Professional Conduct" created an enforceable contractual obligations that Marriott breached by retaliating against him.

Based on this record, the Magistrate Judge made the following findings: (1) that the choice of law to be applied to determine the validity of the alleged employment contract is the *lex loci contractu*, the law of the state in which the contract was formed; (2) that the alleged employment contract was formed in Maryland; and (3) that, under Maryland law, the employee handbook contained an effective disclaimer and therefore did not create an enforceable employment contract. Therefore, because no valid enforceable contract existed, the Magistrate Judge found that all of King's state law contract claims fail and recommended that Marriott's motion for summary judgment be granted.

## DISCUSSION

Plaintiff enumerates two objections to the R&R. First, King objects that the Magistrate Judge erred in finding that Maryland law applies to interpret the existence of an employment contract. He argues that the *lex loci contractu* should not govern the validity of the alleged employment contract because the employment contract was substantially performed in South Carolina and was breached in South Carolina. Accordingly, he asserts that South Carolina choice

---

[3] King also asserted a federal cause of action for retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. The court dismissed this federal claim in its entirety on June 19, 2007.

of law dictates that South Carolina law governs this contract dispute. He also argues that, even if the *lex loci contractu* determines the applicable law, no evidence proves that King received and signed the handbook forming the alleged employment contract in Maryland rather than in South Carolina. Second, King asserts that, under the law of either state, a genuine issue of material fact exists as to whether the handbook created an employment contract.

The R&R makes only a recommendation to the court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 269 (1976). This court is charged with conducting a *de novo* review of any portion of the R&R to which a specific objection is registered and may accept, reject, or modify, in whole or in part, the recommendations contained in that report. 28 U.S.C. § 636(b)(1). Accordingly, the court reviews *de novo* the Magistrate Judge's determination regarding both the choice and the application of state law.

As an in initial matter, the court must determine the applicable state law in this diversity action. Because this case is before a Federal Court in the District of South Carolina, all parties agree that South Carolina *choice* of law applies to King's state law claims. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941) (holding that a federal court sitting in diversity must apply the choice of law rules of the state in which it sits). All of King's claims - breach of contract, breach of contract accompanied by a fraudulent act, and breach of implied covenant of good faith and fair dealing - are actions *ex contractu*; as such, it is clear that the court must analyze these actions under the choice of law rules for contracts. *See Lister v. NationsBank of Delaware, N.A.*, 494 S.E.2d 449, 455 (S.C. Ct. App. 1997). In *Livingston v. Atlantic Coast Line R.R.,* 180 S.E. 343 (S.C. 1935), the South Carolina Supreme Court discussed the traditional choice of law provision for contracts:

> It is fundamental that unless there be something intrinsic in, or extrinsic of, the contract that another place of enforcement was intended, the *lex loci contractu* governs. If the contract be silent thereabout, the presumption is that the law governing the enforcement is the law of the place where the contract is made. "The act of the parties in entering into a contract at a particular place, in the absence of anything shown to the contrary, sufficiently indicates their intention to contract with reference to the laws of that place; hence the rule as it is usually stated is that a contract as to its validity and interpretation is governed by the law of the place where it is made, the *lex loci contractus;* or more accurately, that contracts are to be governed as to their nature, validity and interpretation by the law of the place where they are made, unless the contracting parties clearly appear to have had some other place in view."

*Livingston,* 180 S.E. at 345; *see also Witt v. American Trucking Associations, Inc.,* 860 F. Supp. 295 (D.S.C. 1994) (explaining that in a breach of an employment contract claim, South Carolina courts apply substantive law of place where employment contract at issue was formed where contract's formation, interpretation, or validity is at issue; however, where performance of employment contract is at issue, law of place of performance governs); *Joye v. Heuer*, 813 F. Supp. 1171 (D.S.C. 1993) ("South Carolina's choice of law rule . . . is *lex loci contractu*, or the law of the place where the contract is made governs the contract.").

This case concerns whether King's receipt and signing of Marriott's employee handbook created enforceable contractual obligations between King and Marriott. In other words, the issue in this case is the validity of an alleged employment contract. Because South Carolina choice of law dictates that a contract's validity is determined by "the law of the place where they are made," the Magistrate Judge correctly found that the substantive law of the place the contract was allegedly formed applies.

In this case, however, it is unclear where Marriott distributed the employee handbook at issue. King has no recollection of when or where he received and signed the handbook. The evidence indicates that, after 1993, King lived and performed a significant portion of his job in

7

Hilton Head, South Carolina, but reported to his supervisors and maintained his office in Bethesda, Maryland. Given this evidence, the court finds it equally likely that King received and signed the handbook in Maryland as in South Carolina. The court finds however, that a choice of law determination is unnecessary as, under the law of either state, the handbook did not form an enforceable employment contract as a matter of law:

### A.     Maryland Law

In Maryland, an employment relationship of indefinite term is, with few exceptions, presumed to be at-will, terminable by either party at any time. *Adler v. American Standard Corp.,* 432 A.2d 464 (Md. 1981). Maryland courts recognize a limited exception to at-will employment for employer policy statements, such as those found in handbooks and on applications, "when, with knowledge of their existence, employees start or continue to work for the employer." *Dahl v. Brunswick Corp.,* 356 A.2d 221 (Md. 1976) (holding that severance pay policy was part of employment contract). Nevertheless, Maryland courts have refused to find employment contracts where an express disclaimer was included. *See Fournier v. United States Fidelity & Guar. Co.,* 569 A.2d 1299 (Md. Ct. App. 1990) (finding that because application for employment contained disclaimer, it did not create a contract as a matter of law), *cert. denied,* 573 A.2d 1337 (Md. 1990); *Conkwright v. Westinghouse Elec. Corp.*, 739 F. Supp. 1006 (D. Md. 1990), *decision aff'd*, 933 F.2d 231 (4th Cir. 1991) (applying Maryland law) (holding that although the employee handbook originally provided to the employee allegedly lacked an express disclaimer of implied contract, the employee's continued employment with the company following the subsequent inclusion of the disclaimer in the handbook rendered the disclaimer binding). Where a handbook expressly states that it does not create an employment contract, Maryland courts have upheld the disclaimer as

effective, without regard to the disclaimer's size, font or location within the handbook. For example, in *Bagwell v. Peninsula Regional Medical Center*, the Maryland Court of Appeals found as a matter of law that a handbook did not create a contract where it provided, in the same font and size as the rest of the handbook provisions, that "the Handbook does not, and is not intended to, cover these materials in detail or serve as a contract between you and [Peninsula]." 665 A.2d 297, 307 (Md. Ct. App. 1995).

Maryland courts have also recognized the effectiveness of an express disclaimer even when the handbook contains a definite promise which, by itself, appears to limit an employer's discretion. In *Castiglione v. Johns Hopkins Hosp.*, the hospital's employee handbook contained a statement that it "does not constitute an express or implied contract." 517 A.2d 786, 792 (Md. Ct. App. 1986). This same handbook also specified that, before an employee would be discharged, the supervisor would review the employee's job performance with the employee. Although the plaintiff, an at-will employee, attended such an evaluation meeting, her supervisor did not there discuss the plaintiff's job performance before discharging her. She sued for breach of contract, arguing that the employee handbook required the employer to review the employee's record with the employee prior to termination. The trial court granted summary judgment based on the disclaimer. The Court of Appeals affirmed, explaining that

> the appellee expressly negated, in a clear and conspicuous manner, any contract based upon the handbook for a definite term and reserved the right to discharge its employees at any time. The provisions for review, when viewed in the larger context, were but "general policy statements" not amounting to an offer of employment for a definite term or requiring cause for dismissal. . . . The purpose of the [handbook] exception to the at will doctrine is to protect the legitimate expectations of employees who have justifiably relied on manual provisions precluding job termination except for cause. Justifiable reliance is precluded where, as in the case at hand, contractual intent has been expressly disclaimed.

*Id.* at 793 (citation omitted). *See also Hrehorovich v. Harbor Hosp. Center, Inc.,* 614 A.2d 1021 (Md. Ct. App. 1992) (applying reasoning of *Castiglione* to disclaimer found in hospital by-laws, as well as in employee handbook).

In this case, the Marriott handbook contained a disclaimer which satisfies the requirements of Maryland law. On page two of this handbook is a section entitled "**Employer at Will**." (Handbook at 2, emphasis in original.) In this section, Marriott explains that "[n]othing in this manual shall be deemed to alter the 'at will' status of associates working at the company or create a contract of employment for any specific period of time." On the last page of the handbook, King signed a "Statement of Understanding," affirming that he had "read, understood, and agree[d] to adhere to the information contained in this booklet regarding the below referenced topics," including the "Employer at Will" provision. The Marriott disclaimer, like the disclaimers in *Castiglione* and *Bagwell*, expressly states that the handbook does not create a contract of employment. Consequently, King cannot "reasonable assert justifiable reliance on any of the terms of the handbook." *Bagwell*, 665 A.2d at 309. As such, the Magistrate Judge correctly found that under Maryland law the handbook did not create an enforceable employment contract.[4] Therefore, if

---

[4] The court further notes that Maryland courts also refuse to find employment contracts where the employer's handbook made only general statements of policy. *See, e.g., MacGill v. Blue Cross of Md.*, 551 A.2d 501 (Md. Ct. App. 1989), *cert. denied,* 556 A.2d 673 (Md. 1989). The Maryland Court of Appeals explained in *Staggs v. Blue Cross of Md.,* 486 A.2d 798 (Md. Ct. App. 1985), that promises with potentially enforceable specificity include statements "affording post-termination benefits, such as severance pay, and those affording pre-termination benefits, such as requiring that termination be for cause or setting forth a prerequisite mechanism for rehabilitating a deficient employee." On the other hand, an employer's promises of "the opportunity to apply for vacant positions . . . and its commitment to fill those vacancies with the most qualified applicant, consistent with the law, fairness, and its expressed intention to take affirmative action" are not contractual undertakings under Maryland law. *MacGill,* 551 A.2d at 501.

In this case, the anti-retaliation language in the handbook's "Guarantee of Fair Treatment" policy and the "Policy on Harassment & Professional Conduct" clearly falls into the latter category

Maryland law applies, all of Plaintiff's state law contract claims fail and Defendants' motion for summary judgment must be granted.

  **B.** **South Carolina Law**

  Under South Carolina law, as under Maryland law, an at-will employee may be terminated at any time for any reason or for no reason, with or without cause. *Stiles v. Am. Gen. Life Ins. Co.,* 516 S.E.2d 449, 450 (S.C. 1999). But when an employee's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract. *Conner v. City of Forest Acres,* 560 S.E.2d 606, 610 (S.C. 2002).

  If an employer wishes to issue an employee handbook or manual without being bound by it and with a desire to maintain the at-will employment relationship, the employer may do so by inserting a conspicuous disclaimer into the handbook. *Small v. Springs Indus., Inc.,* 292 S.C. 481, 485, 357 S.E.2d 452, 455 (1987). The South Carolina Supreme Court has held that a disclaimer appearing in bold, capitalized letters, in a prominent position, is conspicuous. *Marr v. City of Columbia,* 307 545, 547, 416 S.E.2d 615, 616 (S.C. 1992); *cf. Johnson v. First Carolina Fin. Corp.,* 305 S.C. 556, 409 S.E.2d 804 (S.C. Ct. App. 1991) (finding disclaimer appearing in all-capitalized letters, in a prominent position, conspicuous). Further, the South Carolina General Assembly has passed legislation requiring disclaimers to be in underlined, capitalized letters, appearing on the first page of the handbook, and signed by the employee. S.C. Code Ann. § 41-1-110 (Supp.2004).

---

of promises. (See the full text of these policies on pages 11 and 12 of this Order) For this reason, under Maryland law, these provisions of the handbook "bound [Marriott] only in the moral sense." *Bender v. Suburban Hosp., Inc.*, 758 A.2d 1090, 1112 - 1113 (Md. Ct. App. 2000). As such, even if the disclaimer were ineffective - which it isn't - the Magistrate Judge correctly found that no enforceable employment contract exists under Maryland law.

Clearly, under this rule, the "At Will Employment" provision of the Marriott Handbook is not conspicuous as a matter of South Carolina law. It is not underlined, capitalized, or on the first page of the handbook. Finding the disclaimer not conspicuous, the court must now consider whether, as a matter of law, the handbook contains a promise that may be the basis of a contract. King contends that the "Guarantee of Fair Treatment" policy and the "Policy on Harassment & Professional Conduct" constituted promises,[5] and that Marriott violated these promises when it fired him in retaliation for making an EEOC complaint. In full, the "Guarantee of Fair Treatment" policy provides:

> Marriott International, Inc.'s policy provides that every associate, regardless of position, be treated with respect and in a fair and just manner at all times. In keeping with its long recognized policy, all persons will be considered for employment, promotion or training on the basis of qualifications without regard to age, race, color, religion, sex, national origin, sexual orientation, disability or veteran status.
> We recognize that, being human, mistakes may be made in spite of our best efforts. We want to correct such mistakes as soon as they happen. The only way we can do this is to know of your concerns and complaints. NO MEMBER OF MANAGEMENT IS TOO BUSY TO HEAR CONCERNS OR COMPLAINTS OF ANY ASSOCIATE.
> Your concern may be such that you prefer to discuss it directly with your Human

---

[5] The handbook at issue also contains a mandatory, progressive discipline procedure. Generally, South Carolina courts have held that "[w]hen an employer discharges a covered employee without adhering to the mandatory procedures, the employee may maintain an action for wrongful discharge against the employer." *Grant v. Mount Vernon Mills, Inc.*, 634 S.E.2d 15, 20 (S.C. Ct. App. 2006); *see Hessenthaler v. Tri-County Sister Help, Inc.*, 616 S.E.2d 694, 697-98 (S.C. 2005) (citing *Conner v. City of Forest Acres,* 560 S.E.2d 606, 610-11 (S.C. 2002)).

In this case, the Marriott handbook does not contain a conspicuous disclaimer. Therefore, under South Carolina law, a genuine issue of material fact exists as to whether the progressive discipline procedure in the handbook altered the employment at-will status. However, even assuming Marriott was contractually obligated to comply with the progressive discipline procedure prior to terminating an employee, King does not allege that Marriott violated this procedure. Rather, King asserts that the handbook's Guarantee of Fair Treatment and Policy on Harassment & Professional Conduct created a contractually enforceable obligation that Marriott not retaliate against him for reporting acts of discrimination.

12

> Resources Representative. Always feel free to do so. It is the policy of Marriott International Inc. that all associate suggestions and complaints shall be given full consideration. There will be no discrimination or recrimination against any associate because the associate presents a complaint or problem.

The "Policy on Harassment & Professional Conduct" provides that:

> The Company strictly prohibits retaliation against any person by another associate for using this complaint procedure, reporting perceived harassment, or for filing, testifying, assisting or participating in any manner in any investigation, proceeding or hearing. An associate who brings such a complaint to the attention of the Company in good faith will not be adversely affected as a result of reporting the harassment.

Both of these provisions of the handbook state general policies of Marriott International. Under South Carolina law, a general policy statement is enforceable as a contract only if the statement is "definitive in nature, promising specific treatment in specific situations." *Hessenthaler,* 616 S.E.2d at 698. In this case, Marriott's promise that "there will be no discrimination or recrimination" against an employee who asserts a complaint against the Company does not create an expectation that employment is guaranteed or that a particular process must be complied with before an employee is terminated. *See id.* (finding that because nondiscrimination provision was not specific and did not make any promises regarding disciplinary procedure or termination decisions, the handbook did not contain promises enforceable as a contract);[6] *Grant v. Mount Vernon Mills, Inc.*, 634 S.E.2d 15, 21 (S.C. Ct. App. 2006) (holding that the policy statement

---

[6] The South Carolina Supreme Court found in *Hessenthaler* that, unlike a mandatory, progressive discipline procedure, a general policy statement of nondiscrimination does not alter an employee's at-will status. 616 S.E.2d at 698. In so finding, the Court cited with approval *McKenzie v. Lunds, Inc.,* 63 F.Supp.2d 986, 1003 (D. Minn. 1999) (holding that nondiscrimination policy statements in employee handbook are legally insufficient to sustain a breach-of-contract claim; such policies are too indefinite to form a contract between employer and employee) and *Cherella v. Phoenix Technologies Ltd.,* 586 N.E.2d 29, 31 (Mass. App. Ct. 1992) (holding that an equal opportunity policy announced in an employee handbook did not establish contractual rights supporting a breach-of-contract claim).

of Mount Vernon to be "fair and just" did not create enforceable contract).  Consequently, under South Carolina law, these policy statements do not create a contract or otherwise alter King's at-will status.

The court further finds that even assuming the handbook altered King's at-will status, King has failed to present a genuine issue of material fact that his termination violated any handbook policy.  The evidence, considered in the light most favorable to Plaintiff, indicates that Marriott's decision to terminate the REM position was unrelated to either Plaintiff's performance or his EEOC complaint.  Indeed, the uncontroverted evidence is that the decision was made almost a year before King ever filed a complaint and was applied equally to all employees holding an REM position.  As such, no evidence supports King's claim that his termination was in retaliation for his filing of an EEOC complaint.  Further, the handbook does not promise that Marriott will rehire an employee after his position has been terminated.  As such, once the REM position was terminated, Marriott had no duty to hire King for any of the RDE or other positions to which he applied.  For these reasons, even if the handbook's policy statements were enforceable promises, King has not presented a genuine issue of fact that Marriott breached these promises.  Therefore, the Magistrate Judge correctly found Marriot is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant Marriott International's Motion for Summary Judgement is **GRANTED.**

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**August 7, 2007.**